ASHLEY B. CARRICK, PETITIONER, v. FIRST CRIMINAL
COURT OF JERSEY CITY, ANTHONY BOTTI, JUDGE;
SECOND CRIMINAL COURT OF JERSEY CITY, JOHN
F. SATURNIEWICZ, JUDGE; AND HOBOKEN RECORD-
ER'S COURT, ROBERT W. EMERY, RECORDER, DE-
FENDANTS.

Argued December 13, 1940—Briefs submitted January 13, 1941
Decided June 4, 1941.

Before Justices CASE, DONGES and HEHER.

For the rule, *Lum, Tamblyn & Fairlie* (*Ralph E. Lum,*
of counsel).

*Contra, John J. Fallon* and *Charles Hershenstein* (*J. Emil
Walscheid,* of counsel).

The opinion of the court was delivered by

HEHER, J. Under chapter 201 of the laws of 1940 (*N. J.
S. A.* 2:212-4.4), the "Fourth Criminal Judicial District of
the County of Hudson" came into being; and thereafter, on

October 4th, 1940, the legislature in joint session, pursuant to *R. S.* 1937, 2:212-1, *et seq.,* as amended by chapter 200 of the laws of 1940 (*N. J. S. A.* 2:212-1, *et seq.*), elected petitioner judge of the court thereby constituted in that territorial district. He thereupon qualified and is now functioning as such. This court has found that the creation of the tribunal was a valid exercise of legislative power. *Wilentz* v. *Galvin,* 125 *N. J. L.* 455.

It is averred in the petition herein that under *R. S.* 2:213-1, as amended by chapter 200 of the laws of 1940, *supra,* the court thus formed is invested with exclusive cognizance of offenses denounced by title 2, subtitle 15, of the Revision of 1937; that the judges of the Hoboken Recorder's Court and of the First and Second Criminal Courts of the City of Jersey City, the provision granting exclusive jurisdiction to the newly-organized court to the contrary notwithstanding, have since "repeatedly and consistently" exercised their pre-existing jurisdiction of such offenses; and that petitioner, "as Judge of the Court of the Fourth Criminal Judicial District of Hudson County is without any other proper, adequate and immediate remedy to prohibit the defendant courts and the judges thereof from usurping the exclusive jurisdiction" of his tribunal. And the prayer is for a writ of prohibition enjoining these courts and the judges thereof "from exercising or attempting to exercise any and all jurisdiction for violations" of the last cited statute.

Prohibition is a prerogative writ little known to our jurisprudence. We are aware of but three cases in which it was invoked, and in each the application was denied. *State* v. *Price,* 8 *N. J. L.* 358; *Ruh* v. *Frambach,* 47 *Id.* 85; *Van Winkle* v. *Caffrey,* 12 *N. J. Mis. R.* 834. Presumably, this nonuser has been due to the availability of other sufficient remedies, for it is a common law remedy of ancient origin and as such was incorporated in our judicial system by force of article X, paragraph 1, of the State Constitution. And the legislature has quiet recently given recognition to it as a subsisting extraordinary remedy. By chapter 190 of the laws of 1938, this court was invested with authority to make rules regulating the practice and procedure on prohibition. *Pamph. L., p.* 409; *N. J. S. A.* 2:80-4.

Since the scope of this remedial process has not been enlarged by statute or practice, it necessarily exists in our jurisprudence as it was at common law at the time of the adoption of our constitution. And so we must have recourse to that system at that particular time for its true function and significance, and disregard the subsequent modifications effected by statute or practice in England.

The writ of prohibition is as old as the common law itself. Glanville, the author of the earliest known work upon English law, written about the year 1181, gives several forms of the writ as then in use. The jurisdiction was generally exercised only by the King's Bench, though not exclusively confined to that judicial authority. 3 *Blk. Com.* 112; *High's Extraordinary Legal Remedies* (*3d ed.*), § 764. Bacon thus states the origin and reason of the writ: "As all external jurisdiction, whether ecclesiastical or civil, is derived from the crown, and the administration of justice is committed to a great variety of courts, hence it hath been the care of the crown, that these courts keep within the limits and bounds of their several jurisdictions prescribed them by the laws and statutes of the realm. And for this purpose the writ of prohibition was framed; which issues out of the superior courts of common law to restrain the inferior courts, * * *. The object of prohibitions in general is, the preservation of the right of the king's crown and courts, and the ease and quiet of the subject. * * * The king may sue for a prohibition, though the plea in the spiritual court be between two common persons, because the suit is in derogation of his crown and dignity." 8 *Bacon's Abridgement,* 206, 207, 210. Blackstone treats of the writ under the head of "Cognizance of Private Wrongs;" and he defines it as a remedy for injury ensuing from "encroachment of jurisdiction, or calling one *coram non judice* (before a judge unauthorized to take cognizance of the affair), to answer in a court that has no legal cognizance of the cause." He continues: "The party aggrieved in the court below applies to the superior court, setting forth in a suggestion upon record the nature and cause of his complaint, in being drawn *ad aliud examen* (to another examination or trial), by a jurisdiction or manner

of process disallowed by the laws of the kingdom: upon which, if the matter alleged appears to the court to be sufficient, the writ of prohibition immediately issues; commanding the judge not to hold, and the party not to prosecute, the plea." 3 *Blk. Com.* 111-113. "The foundation for the writ of prohibition, as shown by the old books, consisted of: first, contempt of the crown, and disherison of it in taking on them judicial power where they have no right; second, is a damage to the party." *Ede* v. *Jackson, Fortesc.* 345; 92 *Reprint* 883.

It was by this process that the courts of common law preserved and extended their jurisdiction, "keeping other tribunals to their own peculiar province, and that they protected parties in their common law rights as opposed to rights good at ecclesiastical law. At a later day the Chancery, in its struggle with common law courts, employed the injunction to effect a similar purpose; but there was this important difference between the prohibition of common law courts and the injunction of Chancery, that the injunction restrained only parties, while the prohibition restrained both parties and courts. Only, therefore, in its effect in restraining parties can we say that the prohibition anticipated the injunction." *Hazeltine, Essay on Early Equity, in Vinogradoff (editor), Essays in Legal History,* 277. Its principal use in early times having been the prevention of what was deemed to be the encroachment of the ecclesiastical upon the civil courts, the English authorities upon the subject are largely confined to questions of ecclesiastical law which have no pertinency in this country save as revelatory of the reach and scope of the writ.

The extraordinary power of the crown thereby exerted was justifiable only in cases of extreme necessity, *i. e.,* where the exercise of the unauthorized jurisdiction would be productive of injury for which there was no other ample remedy. It was not issuable where adequate redress could be had by the ordinary mode, either at law or in equity. And at common law error could not be assigned upon a refusal of a prohibition, since there was no final judgment between the parties. *Bishop of St. David* v. *Lucy,* 1 Ld. Raym. 539.

Thus it is that in design prohibition was and in practice

has been essentially a civil remedy, afforded in a civil action; and while in this country and in Canada it has been directed to courts of criminal and *quasi*-criminal jurisdiction, we are not advised that it had such vogue in England when our constitution became effective. *Farnsworth* v. *Montana,* 129 *U. S.* 104; 9 *S. Ct.* 253; 32 *L. Ed.* 616; *Woods* v. *Cottrell,* 55 *W. Va.* 476; 47 *S. E.* 275; *Noll* v. *Daily;* 72 *W. Va.* 520; 79 *S. E. Rep.* 668; 50 *C. J.* 659, 672, 689. But the decision of this case need not turn on that point.

Plainly, the true function of this high prerogative writ is the prohibition of an unwarranted assumption or excess of jurisdiction in the particular case rather than to the general demarcation and delimitation of judicial authority. Such is implicit in the cases at common law.

To warrant a prohibition to an inferior court for a want or excess of jurisdiction, under the common law as it was when incorporated in our judical system, it was essential that a plea to the jurisdiction should be tendered in that court before imparlance, and that the court should refuse to entertain the plea. And it was requisite that the plea be verified, and tendered in person during the sitting of the inferior court. *Edmundson* v. *Walker, Carth.* 166; *Bouton* v. *Hursler,* 1 *Barn. K. B.* 171; *Sparks* v. *Wood,* 6 *Mod.* 146; *Clerk* v. *Andrews,* 1 *Show.* 12; *Ex Parte Williams,* 4 *Ark.* 537. In *Cox and St. Albans' Case,* 1 *Mod. Rep.* 81, the rule was stated thus: "In transitory actions, if they will plead a matter that ariseth out of the jurisdiction, and swear it before imparlance, and it be refused, prohibition shall go. There was a case in which it was adjudged: 1. That upon a bare surmise, that the matter ariseth out of the jurisdiction, the court will not grant a prohibition. 2. It must be pleaded, and the plea sworn, and it must come in before imparlance. If all this were done, we would grant a prohibition here. It was also agreed in that case, that the party should never be received to assign for error that it was out of the jurisdiction; but it must be pleaded. *Twisden.* So in this court, when there is a plea to the jurisdiction, as that it is within a county palatine, they plead it before imparlance, and swear their plea."

Such was the rule at common law until comparatively recent

times. In 1831, modifications were effected by statute. 1 *Will.
4, c. 21. Mayor, &c., of London* v. *Cox,* 36 *Law J. Rep.
(N. S.) Exch.* 225; *S. C., Law Rep.* 2 *E. & I. App.* 239;
*L. Rep.* 2, *H. L.* 239; *Sewell* v. *Jones,* 1 *L. N. & P.* 525; 19
*L. J. Rep. (N. S.) Q. B.* 372; *Wadsworth* v. *The Queen of
Spain,* 17 *Q. B. Rep.* 171; 20 *Law J. Rep. (N. S.) Q. B.* 488.
And it is generally held in this country that the common law
rule obtains, "and the writ will not go to a subordinate tri-
bunal in a cause arising out of its jurisdiction until the want
of jurisdiction has first been pleaded in the court below and
the plea refused." *High's Extraordinary Legal Remedies,*
§ 773.

It is the commonly accepted view, at least in this country,
that the essential function of prohibition is to enjoin the
prosecution of a particular pending action or proceeding
*coram non judice,* and not that of a general injunction against
the exercise of jurisdiction. The writ does not lie to prevent
the institution of an action or prosecution. 50 *C. J.* 662.
Prohibition will not issue in a particular case where it "is not
justified for the sole purpose of establishing a principal to
govern other cases." *United States* v. *Hoffman,* 4 *Wall.* 158:
18 *L. Ed.* 354. The writ "operates only upon the particular
suit or proceedings in the court to which it is directed, and
it does not affect or stay proceedings in other courts on ques-
tions pertaining to the former controversy." *High's Extra-
ordinary Legal Remedies,* § 776. It "has a proper but a
restricted and limited office, and it cannot be enlarged so as
to bring within its scope and operation questions merely col-
lateral or incidental to its direct purpose, or more or less
intimately connected with such purpose and object. It
cannot be made a dragnet by means of which all controverted
and litigated questions between individual suitors may be
brought into court and tried and determined. A writ of
prohibition is to prevent the exercise by a tribunal possessing
judicial powers of jurisdiction over matters not within its
cognizance, or exceeding its jurisdiction in matters of which
it has cognizance. * * * It is a proper remedy when the
inferior court either entertains a proceeding in which it has
no jurisdiction, or when having jurisdiction, it assumes to

exercise an unauthorized power." *Thomson* v. *Tracy,* 60 *N. Y.* 31.

We have not been cited to any authority at common law for the use of this preventive process under the circumstances here presented; and the absence of instance would seem to be cogent evidence that such use was unknown to that system.

Though in some of our American jurisdictions the range of the writ has been extended by statute or practice, in ours it is limited strictly to its common-law office, and we are not at liberty to enlarge the jurisdiction. That is a legislative function.

And the common law laid it down that the writ was a discretionary remedy when solicited by a stranger, but was *ex debito justitiæ* when sought by a party aggrieved by a clear usurpation of jurisdiction, and there was no ordinary process of law or equity which afforded adequate relief. *Forster* v. *Forster,* 32 *Law J. Rep.* (*N. S.*) *Q. B.* 312; *Mayor, &c., of London* v. *Cox, supra.* In a case decided in 1875, the view that judicial discretion is invoked when a stranger intervenes is challenged. *Worthington* v. *Jeffries,* 44 *L. J.* (*N. S.*) 209. In this country the prevailing view is that it is not a writ of right but is in essence discretionary, at least when sought by a stranger to the proceeding. *Smith* v. *Whitney,* 116 *U. S.* 167; 6 *S. Ct.* 570; 29 *L. Ed.* 601; *People* v. *Westbrook,* 89 *N. Y.* 152; *High's Extraordinary Legal Remedies,* § 765.

Moreover, the public injury ensuing from a want or excess of jurisdiction is fully remediable by Chancery in the exercise of its ordinary jurisdiction as a court of common law, more ancient than the court of equity, whose equitable powers have been termed "extraordinary." From the earliest times this jurisdiction has been invocable by civil information exhibited by the attorney-general in the name of the king to redress injuries public in essence, *i. e.,* "matters by which the public or public rights were affected by unlawful acts done in the name of the king or by some agency or instrumentality of his government." Such authority is inherent in the sovereign; and it is exerted by the means thus provided by the common law for preventing jurisdictional arrogations and excesses in

derogation of the crown. The information may be filed with or without a relator. *Wilson, Attorney-General,* v. *State Water Supply Commission,* 84 *N. J. Eq.* 150; 3 *Blk. Com.* 47, *et seq.; Pom. Eq. Jur.* (*4th ed.*) §§ 12, 31. See, also, *Attorney-General* v. *Delaware and Bound Brook Railroad Co.,* 27 *N. J. Eq.* 1; *affirmed, Id.* 631; *Attorney-General* v. *Delaware and Bound Brook Railroad Co.,* 38 *N. J. L.* 282. "The conservation of public interests is with the state and its attorney-general." *Newark, &c.,* v. *Passaic,* 45 *N. J. L.* 393.

There is no occasion to determine whether under our jurisprudence a stranger may, in the enforcement of public order, invoke this sovereign authority by prohibition for want or excess of jurisdiction.

The rule to show cause is accordingly discharged, but without costs.